David J. DECKER,
Plaintiff-Respondent-Cross-Appellant,

v.

Frederick J. DECKER,
Defendant-Appellant-Cross-Respondent,†

Douglas MANN, Receiver-Respondent.

Court of Appeals

*No. 2004AP3112. Submitted on briefs April 4, 2006.*
*—Decided November 28, 2006.*

2006 WI App 247

(Also reported in 726 N.W.2d 664.)

† Petition to review filed.

On behalf of the defendant-appellant-cross-respondent, the cause was submitted on the briefs of *Stephen E. Kravit, Leonard G. Leverson* and *Sarah J. Friday*, of *Kravit, Hovel, Krawczyk & Leverson, S.C.*, of Milwaukee.

On behalf of the receiver-respondent, the cause was submitted on the brief of *Robert K. Steuer* of *Robert K. Steuer Law Office* of Milwaukee.

On behalf of the plaintiff-respondent-cross-appellant, the cause was submitted on the briefs of *Randall L. Nash* of *O'Neil, Cannon, Hollman, DeJong, S.C.*, of Milwaukee.

Before Wedemeyer, P.J., Curley and Kessler, JJ.

¶ 1. CURLEY, J.  Frederick Decker appeals the order, sought by the court-appointed receiver, compelling Frederick to sell his interests in several limited liability companies (LLCs) to his brother, David, with whom he was in business. David Decker cross-appeals the order denying his partial summary judgment which sought to enforce a 2002 agreement proposed by Frederick, pursuant to an operating agreement entered into by the parties, and accepted by David, selling Frederick's interests in the LLCs to David for $7,000,000. Because the trial court, in the course of the dissolution process, had the authority to order the sale of Frederick's share of the assets of the LLCs to David, and because the offer by Frederick and the acceptance by David was not an enforceable contract, the trial court properly denied David's request for a partial summary judgment. Consequently, we affirm both de-

terminations. However, we instruct the trial court to correct the order to reflect that Frederick's assets are being sold.

## I. BACKGROUND.

¶ 2.   As noted, David and Frederick are brothers who for many years were in the investment real estate business, which they operated through a number of LLCs. In 1995, they reorganized the business by entering into an operating agreement that formed a new LLC, Decker Investments, LLC. The brothers began having business disputes, and in 2001 they discussed a resolution. Frederick wanted time to evaluate the business and sought information about the properties. In furtherance of resolving the business dispute and having one buy out the other, the brothers agreed to obtain new appraisals for four properties and to use a recent appraisal to evaluate a fifth property. However, following this agreement, there was little movement by Frederick. Believing that the evaluation process was taking an inordinate amount of time to complete, pursuant to the operating agreement, David declared a deadlock on March 18, 2002, and sent Frederick a letter so stating. Frederick did not believe that a deadlock existed and requested that David rescind the deadlock letter sent to him. David refused, and finally, on July 11, 2002, again pursuant to a provision in the operating agreement, Frederick made an offer to buy David's interest in the businesses for $7,000,000. Based upon the recently-obtained appraisals, this offer was approximately two to three times more than David's share of what the properties were worth. Nevertheless, David accepted. Frederick, however, failed to close on the offer. Indeed, when pressed later to describe the actions he had taken to finalize the offer, Frederick could not

point to any specific action that he personally took to close on the offer he made to his brother. Later explanations by Frederick for his actions strongly suggested that the offer was not made in good faith and was effectuated as a preemptive strike by Frederick, who never had any intention of closing. The operating agreement required that David be given thirty days to purchase Frederick's share for the same amount; however, Frederick's later comments also indicate that he made the offer knowing that his brother would not buy the companies for such an exorbitant price, leaving only one solution under the operating agreement—dissolution of the companies.

¶ 3.   In September 2002, David brought suit seeking damages for his loss of the benefit of the bargain because of Frederick's earlier offer and his failure to buy his interest. (Later David filed an amended complaint adding several other causes of action.) In response, Frederick denied that the offer was enforceable, and claimed that, as a result of his failure to close and his brother's failure to buy his interest under identical terms, the operating agreement permitted only the dissolution of the company. After various motions, including David's partial summary judgment motion, were filed and attempts to resolve the matter were unsuccessful, the trial court appointed a receiver to perform an accounting, oversee existing personnel, ensure proper management of the company, and later, sell the properties. After a denial of numerous motions, including the partial summary judgment motion, David proposed to buy Frederick's interest in the properties at the values set by the receiver, a proposal with which the trial court ultimately concurred. The trial court ordered that Frederick sell his interest in the properties to

David.[2] Frederick then successfully sought a stay of the order and brought this appeal.[3] David cross-appealed the trial court's decision denying his partial summary judgment motion seeking to be awarded damages for his losses as a result of Frederick's offer to buy David's interest for $7,000,000 and later reneging on the offer.

## II. ANALYSIS.

¶ 4.    We first address David's cross-appeal because if we agree with him, it will be unnecessary to address Frederick's appeal as it would be rendered moot.

¶ 5.    David maintains that the trial court should have granted his motion seeking partial summary judgment. In *Preloznik v. City of Madison*, 113 Wis. 2d 112, 334 N.W.2d 580 (Ct. App. 1983), we set out the methodology to be used in summary judgment:

> Under that methodology, the court, trial or appellate, first examines the pleadings to determine whether claims have been stated and a material factual issue is presented. If the complaint . . . states a claim and the pleadings show the existence of factual issues, the court examines the moving party's affidavits for evidentiary

---

[2] We note that the trial court orally stated that it was approving the sale of the *assets* of the LLCs, which would be consistent with the dissolution process. However, the written order, signed by a different judge, states:  "The Receiver is authorized to assign and transfer to [David] all *interests* not already owned by [David] in [the LLCs]." Inasmuch as the operating agreement requires that when the company is dissolved the company's assets, rather than an owner's interest in the company be sold, the order should be corrected to reflect that the trial court's true intent was that the assets of the LLCs be ordered sold to David. *See* discussion, *supra* ¶¶ 15–16.

[3] The record suggests that a sale of an LLC-owned property in which Frederick was residing was consummated.

facts admissible in evidence or other proof to determine whether that party has made a prima facie case for summary judgment. To make a prima facie case for summary judgment, a moving defendant must show a defense which would defeat the claim. If the moving party has made a prima facie case for summary judgment, the court examines the affidavits submitted by the opposing party for evidentiary facts and other proof to determine whether a genuine issue exists as to any material fact, or reasonable facts and therefore a trial is necessary.

*Id.* at 116.

¶ 6. "Summary judgment methodology prohibits the trial court from deciding an issue of fact. The court determines only whether a factual issue exists, resolving doubts in that regard against the party moving for summary judgment." *Id.*

¶ 7. David points to Frederick's offer to buy his interests in the LLC for $7,000,000 and his acceptance as a consummated agreement. He argues that "a deal is a deal" and an agreement should be enforced rather than avoided. He further submits that his acceptance of the offer works as an accord and satisfaction and that Frederick is estopped from arguing that the dispute has not been resolved. Consequently, David seeks a remand of the matter to the trial court to determine "the loss to David Decker of the benefit of th[e] bargain."

¶ 8. The trial court denied the summary judgment motion. In its comments, the trial court adopted the arguments of Frederick that by the terms of the operating agreement, the proposed offer "was not binding on the parties." "On the issue of the summary judgment that has been filed by the plaintiff, I am in

147

■■■■■■■■

agreement with the defense . . .– that the 1995 operating agreement – agreement [sic] is controlling." As a result, the trial court denied the motion because the agreement anticipated that an accepted offer might not close and the agreement spelled out what should occur if that happened. We agree. Specifically, paragraph 13.b. sets forth the actions the parties could take once a deadlock was declared:

b. If the controversy is not resolved by mutual agreement of the Members, or by binding arbitration agreed to by them, within sixty (60) days of the Statement Date, the Members shall negotiate with each other for the purchase, sale or redemption of their Interests. *Neither of the Members shall be obligated in any manner to buy or sell during this period. If the dispute is not resolved within ninety (90) days of the Statement Date, either of the Members (the "Offeror") may submit an offer to the other (the "Offeree") stating the purchase price, terms and conditions upon which he or they will, at the option of the Offeree, purchase all, but not less than all, of the Interests of the Offeree, or in the alternative, sell all, but not less than all, of the Offeror's Interests to the Offeree. Within thirty (30) days of receipt of such offer, the Offeree shall inform the Offeror of his election to either sell his or their Interests or purchase the Interests of the Offeror at the price and on the terms and conditions stated in the offer.* Failure to respond to the offer within thirty (30) days shall be deemed to be an election by the Offeree to sell his or their Interests to the Offeror. *If the party purchasing Interests pursuant to an offer under this section fails to close the purchase within sixty (60) days of the election determining which Member or Members will sell his or their Interests, then the other party or parties shall have the opportunity, for a period of thirty (30) days, to purchase the Interests of the other on the same terms and conditions.* The parties

> agree to use their best efforts to make available the assets of the Company to effect a buy-out under this section.

(Emphasis added.) As the agreement explains, neither party was obligated to either buy or sell, and it was anticipated that an accepted offer may not be consummated. Thus, the agreement did not require the offeree to actually close on the properties, and the agreement contains no penalty provisions if an offer is made and the purchase is not closed. While it is true that the operating agreement obligated the members to "use their best efforts to make available the assets of the Company to effect a buy-out," and while it would appear that Frederick's conduct could hardly be characterized as using his best efforts, this language does not automatically make his voluntary offer enforceable. Based on the unambiguous terms of the operating agreement, Frederick's offer and David's acceptance made pursuant to the operating agreement was not enforceable absent additional action. Consequently, we affirm the trial court's determination. Thus, we address Frederick's appeal.

¶ 9. Frederick claims that the trial court had no authority to order the sale of his interests in the LLC to David. He contends that the 1995 operating agreement permitted only certain actions of the members and it did not permit a buyout of Frederick's interests after 150 days from the statement date (the date the deadlock letter was received by Frederick). Frederick is only half right.

¶ 10. To understand the argument, we first explore the brief history of limited liability companies in Wisconsin. As stated in *Gottsacker v. Monnier*, 2005 WI 69, 281 Wis. 2d 361, 697 N.W.2d 436:

A limited liability company (LLC) has been described as "an unincorporated association of investors, called members in LLC parlance, whose personal liability for obligations of the venture are limited to the amount invested." Joseph W. Boucher et al., *LLCs and LLPs: A Wisconsin Handbook* § 1.4 (rev. ed. 1999). It is a distinct business entity that adopts and combines features of both partnership and corporate forms. *Id.*

From the partnership form, the LLC borrows characteristics of informality of organization and operation, internal governance by contract, direct participation by members in the company, and no taxation at the entity level. *Id.* From the corporate form, the LLC borrows the characteristic of protection of members from investor-level liability. *Id.* Flexible in nature, the LLC allows direct involvement and control by its members yet also permits a corporate representative form of governance if the entity elects to be governed by managers. *Id.*

*Id.*, ¶¶ 14–15 (footnote omitted).

¶ 11. According to Wis. Stat. § 183.0102(16),[4] an operating agreement of an LLC "means an agreement in writing if any, among all of the members as to the conduct of the business of a limited liability company and its relationships with its members." As noted, there is an operating agreement signed by both Frederick and David.

¶ 12. Paragraph 13 of the Deckers' operating agreement sets forth the procedures for the sale of interests to be followed in the event of a deadlock. It is undisputed that a sale of the interests did not close and that the dispute was not otherwise resolved within the time limits set forth in paragraph 13. Frederick relies

---

[4] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

on paragraph 13.b. as support for his position that David can no longer buy him out and the properties must be sold on the open market, as the time limits on a member's ability to buy out another member were not met.

¶ 13.   After reviewing the record, we conclude that in effect, what Frederick did, as the trial court suggested, was to sabotage the operating agreement's provisions for a buy-out by making an outrageous offer of $7,000,000 for David's interest when it was worth only approximately $2,500,000, and then making no effort to close on the offer. By doing so, he foreclosed the possibility that one of the two would buy out the other according to the terms of the operating agreement. This is so because while David was anxious to be the seller at $7,000,000, he was not inclined to be the buyer at that figure. This left dissolution as the only remedy available under the operating agreement. Frederick, who the record suggests apparently harbors some animosity towards his brother, insists that the properties must all be sold to third parties on the open market, therefore creating considerable costs, including real estate commissions, tax consequences and the like, to both.

¶ 14.   We agree that under paragraph 13.b., no buyout was possible because the time limits had passed; however, because the parties had moved to the next step outlined in the operating agreement, set forth in paragraph 13.c., the trial court's actions were authorized under the agreement. Paragraph 13.c. directs that:

> c. If a sale of Interest is not closed or the dispute is not otherwise resolved within one hundred fifty (150) days of the Statement Date, the Company shall be dissolved by the voluntary action of the Members. The dissolution may be postponed by consent of the Members, if necessary, to accommodate a closing with a

151

third-party purchaser or a purchasing Member, or to otherwise resolve the dispute. If, after the 150th day following the Statement Date (or such later date if agreed to by the Members), the dispute is not resolved, the Members shall take all necessary actions and use their best efforts to cause all directors elected by them to take all necessary actions to liquidate and dissolve the Company in accordance with the law.

The trial court's appointment of a receiver started the liquidation process. David's offer, made with the attempt to resolve the dispute, sought the trial court's permission for the receiver to accept David's offer. David's offer was no different from any other third-party offer, except that it was for all the property interests held by Frederick and it eliminated costly real estate commissions and other miscellaneous costs.

■

¶ 15.  Significantly, because the LLC was to be dissolved, it is necessary to consider paragraph 13.c. in conjunction with paragraph 9 of the operating agreement, which addresses dissolution. Paragraph 9.a. provides that the company shall be dissolved "(2) Upon the sale of all of the real estate owned by the Company," and if "(3) [t]he company has only one (1) Member." Further, paragraph 9.b. provides in pertinent part:  "Upon the dissolution of the Company, the Company shall take full account of the Company's assets and liabilities and the *assets* shall be liquidated as promptly as consistent with obtaining the fair market value thereof . . . ." Accordingly, only the sale of the *assets* of the LLC would be consistent with the dissolution process agreed upon by the Deckers in their operating agreement. Under these circumstances, the operating agreement allowed such a sale and the trial court properly approved, in court, the order of the receiver, seeking to sell the *assets* of the

LLC to David. Because the written order signed by a different judge authorizes the receiver to transfer to David all interests of the LLC, we order the trial court's order be corrected to reflect the sale of the assets, not interests, consistent with the terms of the Deckers' operating agreement.

¶ 16.   We recognize that this conclusion will presumably have negative tax consequences for David; however, the terms of the Deckers' operating agreement permit no other conclusion. We would remind Frederick and David that the operating agreement was voluntarily entered into by them and was not imposed by the court. In sum, under the specific terms of the operating agreement, a sale of LLC *interests* would occur only when an LLC is to continue to exist as a viable company. Here, the operating agreement mandates dissolution of the company. Thus, a sale of the *assets* must occur.

■

¶ 17.   Moreover, the trial court possessed statutory authority to order the sale. WISCONSIN STAT. § 183.0902 entitled Judicial dissolution states that a court may order the dissolution of an LLC when:   "(4) . . . one or more of the members in control of the [LLC] are acting or will act in a manner that is illegal, oppressive or fraudulent."

¶ 18.   WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1991) defines "oppressive" as:   "1 : unreasonably burdensome or severe . . . 2 : TYRANNICAL 3 : overwhelming or depressing to the spirit or senses . . . ." *Id.* at 828. There can be little doubt that Frederick's obstructionist tactics fell within the category of oppressive behavior. Frederick's behavior in this affair has not only lacked good faith, but it also was oppressive. He intentionally made an outrageous offer to buy David out, and when David accepted, did nothing to close the transaction. He

has also opposed every motion brought by David as well as those requested by the receiver. As the trial court commented when ordering that David's offer to buy the assets of the LLC be accepted:  "The only thing I can't give [Frederick] which he seems to dearly want is to intentionally cause further harm to his brother." WISCONSIN STAT. § 183.0902 authorized the trial court to take the action it did. For the reasons stated, the trial court's order denying summary judgment is affirmed, as is the trial court's order permitting David to buy Frederick's share of the properties.

*By the Court.*—Orders affirmed.